IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| TABATHA HUTSON, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | CASE NO.: 3:18-cv-00048-TWP-DCP |
| } | JURY TRIAL DEMANDED |
| CONCORD CHRISTIAN SCHOOL, LLC, and } | |
| FIRST BAPTIST CONCORD FOUNDATION, INC., } | |
| } | |
| Defendants. } | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the Plaintiff, Tabatha Hutson ("Plaintiff" or "Ms. Hutson"), by and through her counsel of record, pursuant to FED. R. CIV. P. 56 and Paragraph 5(b) of the Court's Scheduling Order **[Doc. 13]**, and respectfully submits the following Response in Opposition to Defendants Concord Christian School, LLC ("Concord") and First Baptist Concord Foundation, Inc.'s Motion for Summary Judgment.

**I.     INTRODUCTION**

For all the reasons set forth herein, Defendants' Motion for Summary Judgment should be denied.[1] When all material facts are construed in favor of Plaintiff, it is undisputed that: (1) Plaintiff's termination was motivated by sex and pregnancy discrimination; and, (2) Plaintiff was not a 'minister' as that term is defined by United States Supreme Court and Sixth Circuit precedent. Because Plaintiff was not a minister, and because Defendants' decision to terminate its employment relationship was motivated by discrimination on

---

[1] Plaintiff consents to dismissal of her claims against First Baptist Concord Foundation, Inc. Discovery revealed this entity was not an employer of Plaintiff relative to any of the illegal conduct forming the basis of this action.

1

the basis of sex and pregnancy, summary judgment should be denied to Defendant and granted in favor of Plaintiff pursuant to FED. R. CIV. P. 56(j).

## II. STATEMENT OF FACTS

### A. The parties

Ms. Hutson was hired by Concord as an elementary school teacher in 2011.[2] She was a good teacher who taught at Concord for six (6) academic years.[3]

Leigh Ledet ("Ledet") is Concord's Elementary School Principal, a position she has held since approximately 2008.[4] She was never a supervisor prior to becoming Concord's Elementary School Principal.[5] Ledet has no degrees in any Human Resources-related field. She holds no Human Resources certifications. She has never taken or attended any Human Resources-related educational courses.[6]

### B. Ms. Hutson learns she is pregnant

At the end of March 2017, Ms. Hutson learned she was pregnant with her second child.[7] She did not share with Concord's administration the fact she was pregnant until May 2, 2017.[8] Ms. Hutson only shared her pregnancy news with her fellow second-grade teachers at Concord.[9]

### C. Concord terminates Ms. Hutson for being pregnant

At the end of the 2016-2017 academic year, after learning Ms. Hutson was pregnant, Concord decided to terminate its employment relationship with Ms. Hutson.[10] Ledet and Concord's Head of School,

---

[2] Plaintiff's Statement of Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("SUMF"), ¶ 1.
[3] SUMF at ¶ 2.
[4] Id. at ¶ 3.
[5] Id. at ¶ 4.
[6] Id. at ¶ 5.
[7] Id. at ¶ 6.
[8] Id. at ¶ 7.
[9] Id. at ¶ 8.
[10] Id. at ¶ 9.

Mark Kelly, made the decision.[11] At the time, Ledet was Ms. Hutson's direct supervisor.[12] Ms. Hutson's pregnancy was a motivating factor in Concord's decision.[13]

Ms. Hutson was notified of her termination "[w]ithin a few days" of Concord's decision to non-renew her teaching contract for the 2017-2018 academic year.[14] Ledet and Haley Cottrell met with Ms. Hutson on May 2, 2017, to inform her of the decision.[15] During the termination meeting, Ledet told Ms. Hutson she (Ms. Hutson) should "go straighten racks at Stein Mart until things settle down" – or words to that effect. Ledet made clear she was referring to Ms. Hutson's pregnancy.[16]

### D. Concord does not monitor employee sexual activity, only pregnancy

If other employees had not already informed Concord of Ms. Hutson's pregnancy status, it would have had no knowledge Ms. Hutson was engaging in sexual activity outside the confines of marriage.[17] Concord does not monitor the sexual activity of its employees.[18] Concord has never terminated a male employee for engaging in premarital sex.[19]

### E. Ms. Hutson was not a 'minister'

Ms. Hutson never felt "called" to be a teacher of the Baptist faith at Concord.[20] Concord does not offer tenure to any of its teachers.[21] Concord's teacher contracts encompass one (1) academic year; August through May.[22] Concord **does not require** its elementary school teachers to adhere to the **Baptist** faith.[23] At

---

[11] Id. at ¶ 10.
[12] Id. at ¶ 11.
[13] Id. at ¶ 12.
[14] Id. at ¶ 13.
[15] Id. at ¶ 14.
[16] Id. at ¶ 15.
[17] Id. at ¶ 16.
[18] Id. at ¶ 17.
[19] Id. at ¶ 18.
[20] Id. at ¶ 19.
[21] Id. at ¶ 20.
[22] Id. at ¶ 21.
[23] Id. at ¶ 22 (emphasis added).

the time she was hired, Concord **knew** Ms. Hutson was raised in the **Catholic** faith.[24] Ms. Hutson had **not** been baptized into the **Baptist** faith until **one (1) month before** she applied for employment as a teacher for Concord.[25]

Concord does not require its elementary school teachers to have any religious component in their educational background.[26] It also does not require its elementary school teachers to have previous teaching experience at a religiously-affiliated school.[27] During her time teaching at Concord, Ms. Hutson did not take any theology or religious-study courses at any college or university.[28]

Concord's curriculum must meet Tennessee state academic standards.[29] Concord does not maintain a mandated rule as to how its elementary school teachers present educational material to their students.[30] It also does not expect its teachers to insert scriptural references into every lesson. Rather, it expects its teachers to incorporate "the idea of **biblical principles**" in their lessons.[31] Notwithstanding, during her final academic year of employment (2016-2017), Ms. Hutson did not create **any** biblical portion of the lesson plans taught to her second-grade students.[32]

Concord was aware at the time it hired Ms. Hutson that she was not an ordained minister.[33] In fact, Concord did not require Ms. Hutson to be an ordained minister as a condition of her employment.[34] Ms. Hutson had also never been issued a "diploma of education" indicating she was a minister.[35] The job title Concord gave Ms. Hutson (elementary teacher) gives no indication it considered her a "minister" of the Baptist

---

[24] Id. at ¶ 23 (emphasis added).
[25] Id. at ¶ 24 (emphasis added).
[26] Id. at ¶ 25.
[27] Id. at ¶ 26.
[28] Id. at ¶ 27.
[29] Id. at ¶ 28.
[30] Id. at ¶ 29.
[31] Id. at ¶ 30 (emphasis added).
[32] Id. at ¶ 31 (emphasis added).
[33] Id. at ¶ 32.
[34] Id. at ¶ 33.
[35] Id. at ¶ 34.

(or any other) faith.[36] Concord does not define the criteria by which it considers someone a minister, nor has it instructed its employees as to whom it considers ministers.[37] To the contrary, Concord erroneously considers all of its employees ministers, regardless of position.[38]

Ms. Hutson never lead chapel at Concord.[39] She also did not lead daily devotional exercises with her class.[40] Concord simply expected its teachers to be "moral examples" and "Christian role models" to their students, not ministers.[41]

### F. Concord selectively enforces is so-called 'morality code'

Concord's so-called "morality code" prohibits its employees from, among other things, utilizing tobacco products and consuming alcohol.[42] Notwithstanding, Concord does not monitor the alcohol use of its employees, despite the same being a violation of its "morality code".[43] Despite the consumption of alcohol violating Concord's "morality code", Ledet has consumed alcohol during her employment with Concord.[44]

Concord does not evenly apply the prohibitions set forth in its "morality code"; some prohibitions are considered "absolute", whereas others are not.[45] During Ledet's thirteen (13)-year tenure as Elementary School Principal, Concord has non-renewed the teaching contract of at least six (6) elementary educators, all of which (with the exception of Ms. Hutson) were the result of: (1) unavailability of positions; (2) performance deficiencies; and/or, (3) causing disharmony with coworkers. Ms. Hutson is the only employee

---

[36] Id. at ¶ 35.
[37] Id. at ¶ 36.
[38] Id. at ¶ 37.
[39] Id. at ¶ 38.
[40] Id. at ¶ 39.
[41] Id. at ¶ 40.
[42] Id. at ¶ 41.
[43] Id. at ¶ 42.
[44] Id. at ¶ 43.
[45] Id. at ¶ 44.

5

during that period who was terminated or whose contract Concord chose not to renew for alleged violations of the morality code.[46]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Covington v. Vanderbilt Mortg. & Fin., Inc.*, 2015 U.S. Dist. LEXIS 7386 at *14-15 (E.D. Tenn., Jan. 21, 2015) (quoting FED. R. CIV. P. 56(a)) (Reeves, P.). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Id.* at *15 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 FN2, (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993)). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002)).

If the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Id.* (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id.* (citing *Anderson*, 477 U.S. at 250). The Court does not weigh the evidence or determine the truth of the matter. *Id.*

---

[46] Id. at ¶ 45.

(citing *Anderson*, 477 U.S. at 249). Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at *15-16 (quoting *Anderson*, 477 U.S. at 250).

## IV. LAW AND ARGUMENT

### A. <u>It is undisputed Plaintiff's pregnancy status was a motivating factor in Defendants' decision to terminate its employment relationship with Plaintiff.</u>

An employee may prove discrimination based on pregnancy in one of two mutually-exclusive ways: (1) direct evidence; or, (2) indirect evidence through application of the familiar *McDonnell Douglas* burden-shifting paradigm. The first is established by putting forward direct evidence that the defendant had a discriminatory motive in carrying out its employment decision. *Burress v. City of Franklin*, 809 F. Supp. 2d 795, 810 (M.D. Tenn. 2011) (denying summary judgment to employer on ADA failure to accommodate claim) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (citation omitted)). Direct evidence might "take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Id.* (quoting *Smith*, 155 F.3d at 805). Direct evidence of a discriminatory *animus* is rare. Despite its rarity, it is present and dispositive in the instant case.

"The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. UPS*, 135 S. Ct. 1338, 1343 (2015). "[F]ederal and state pregnancy discrimination claims are evaluated generally under the same substantive standards." *Tysinger v. Police Dep't*, 463 F.3d 569, 572 (6th Cir. 2006) (citing *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 471-72 (6th Cir. 2005); *Cleveland v. Federal Express Corp.*, 83 F. App'x 74, 81 FN2 (6th Cir. 2003)). "Under the Pregnancy Discrimination Act provisions of Title VII, discrimination because of, or on the

basis of, pregnancy, childbirth, or related medical conditions is defined as a kind of sex discrimination and is prohibited." *Id.* (citing 42 U.S.C. § 2000e(k)).

"[Mixed motive] claims are based on the plaintiff's allegation that 'race, color, religion, sex [including pregnancy], or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Spees v. James Marine, Inc.*, 617 F.3d 380, 389 (6th Cir. 2010) (quoting Title VII, 42 U.S.C. § 2000e-2(m)). "Allegations of discriminatory conduct thus fall into one of two categories: single-motive claims, 'where an illegitimate reason motivated an employment decision,' or mixed-motive claims, 'where both legitimate and illegitimate reasons motivated the employer's decision.' *Id.* at 389-90 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008)). Thus, to survive summary judgment, Plaintiff need only prove that her sex (including pregnancy) was **a** motivating factor in Defendants' decision to terminate its employment relationship with Plaintiff. *Id.* (citing *White*, 533 F.3d at 400). Plaintiff can meet her burden through the production of direct evidence of discriminatory motive.

Plaintiff's direct supervisor, Ledet, was questioned at her deposition regarding the reasons Defendants chose to terminate its employment relationship with Plaintiff:

> Q. The fact that Ms. Hutson was expecting, did that play any **motivating factor** in the decision the contact?
>
> A. **Yes, it was a factor**.[47]

The cited evidence constitutes direct evidence Plaintiff's pregnancy was a motivating factor in Defendants' decision to terminate its employment relationship with Plaintiff. Accordingly, Defendants are not entitled to summary judgment. To the contrary, the undisputed direct evidence of discriminatory motive entitles Plaintiff to judgment in her favor as a matter of law pursuant to Fed. R. Civ. P. 56(j).

---

[47] Id. at ¶ 12 (emphasis added).

### B. Plaintiff was not a 'minister' pursuant to United States Supreme Court and Sixth Circuit precedent. Accordingly, the 'ministerial exception' doctrine is inapplicable to excuse Defendants' discriminatory conduct.

Defendants may not escape liability to Plaintiff by relying upon the Constitutionally-based 'ministerial exception'; Plaintiff was never a 'minister' of the Baptist faith. Thus, summary judgment through application of the referenced affirmative defense is improper, and the Court should deny the same to Defendants and grant summary judgment in favor of Plaintiff pursuant to FED R. CIV. P. 56(j).

#### 1. Historical background of the 'ministerial exception'

"[T]he 'ministerial exception' to Title VII, [ ] is rooted in the First Amendment's religious protections, and [ ] 'preclude[s] application of [employment discrimination laws such as Title VII] to claims concerning the employment relationship between a religious institution and its ministers.'" *EEOC v. R.G.*, 884 F.3d 560, 581 (6th Cir. 2018) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012)). "'[I]n order for the ministerial exception to bar an employment discrimination claim, the employer must be a religious institution and the employee must have been a ministerial employee.'" *Id.* (quoting *Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 833 (6th Cir. 2015) (internally quoting Hollins v. Methodist Healthcare, Inc., 474 F.3d 223, 225 (6th Cir. 2007))). "'The ministerial exception is a highly circumscribed doctrine. It grew out of the special considerations raised by the employment claims of clergy, which concern[ ] internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law.'" *Id.* (quoting *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 409 (6th Cir. 2010) (internally quoting *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986))) (alteration in original).

#### 2. In *Morgan*, this Court concludes the 'ministerial exception' does not apply after analyzing the *Hosanna-Tabor* factors.

In *Morgan v. Cent. Baptist Church of Oak Ridge*, this Court directly addressed application of the 'ministerial exception' after the Supreme Court's decision in *Hosanna-Tabor*. No.: 3:11-CV-124-TAV-CCS,

2013 U.S. Dist. LEXIS 202769 (E.D. Tenn. Dec. 5, 2013) (Varlan, T.). In *Morgan*, the plaintiff brought suit for sexual harassment and retaliation against her former employer and its pastor. *Id.* at *1. The employer moved for summary judgment, asserting that the 'ministerial exception' barred the plaintiff's claims as a matter of law. *Id.* The plaintiff responded by producing evidence that she was not a 'minister'; and, therefore, the employer's affirmative defense was inapplicable. *Id.* On the issue, the Court denied summary judgment to the employer, holding that the employer had failed to meet its burden, as a matter of law, that the 'ministerial exception' barred the plaintiff's claims. *Id.*

In analyzing the parties' positions, the Court addressed the Supreme Court's decision in *Hosanna-Tabor*, which had been rendered the previous year. *Id.* at *59 (citing *Hosanna-Tabor*, 565 U.S. 171, 132 S.Ct. 694 (2012)). The *Morgan* Court observed:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Cause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at *60 (quoting *Hosanna-Tabor*, 132 S. Ct. at 706). The Court nevertheless noted *Hosanna-Tabor*'s limited application:

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers.

*Id.* at *60-61. Based on the foregoing analysis, the Court refused to extend *Hosanna-Tabor*'s holding "beyond its facts . . . ." *Id.* at *61. The Court continued, "*Hosanna-Tabor* held that for the 'ministerial exception' to bar an employment discrimination claim, two factors must be present: (1) the employer must be a religious institution, and (2) the employee must be a ministerial employee." *Id.* (quoting *Hosanna-Tabor*, 132 S. Ct. at

709). "To determine whether an employee is ministerial under the second prong, the Sixth Circuit has instructed courts to look at the function or 'primary duties' of the employee." *Id.* (citing *Hollins*, 474 F.3d at 226, rev'd on other grounds, *Hosanna-Tabor*, 565 U.S. 171, 132 S. Ct. 694, 705, 181 L. Ed. 2d 650 (2012))." As a general rule, an employee is considered a minister if 'the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship.'" *Id.* (quoting *Hollins*, 474 F.3d at 226).

*Hosanna-Tabor* identified the following non-exclusive factors for lower Courts to utilize in determining the applicability of the 'ministerial exception':

- Did the employer hold out the employee as a minister with a role distinct from that of most of its members?

- Did the employee hold herself as a minister by 'accepting the formal call to religious service, according to its terms'?

- Did the employee refer to herself as a minister?

- Did the employer issue the employee a 'diploma of vocation' in which it identified the employee with the title "[m]inister"?

- Does the employee possess a 'significant degree of religious training followed by a formal process of commissioning'?[48]

- Did the employee claim tax credits reserved for earning income 'in the exercise of the ministry'?

---

[48] In *Hosanna-Tabor* the Supreme Court explained that:

> To be eligible to become a commissioned minister, Perich had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher. She also had to obtain the endorsement of her local Synod district by submitting a petition that contained her academic transcripts, letters of recommendation, personal statement, and written answers to various ministry- related questions. Finally, she had to pass an oral examination by a faculty committee at a Lutheran college. It took Perich **six years** to fulfill these requirements. And when she eventually did, she was commissioned as a minister only upon election by the congregation, which recognized God's call to her to teach. At that point, her call could be rescinded only upon a supermajority vote of the congregation--a protection designed to allow her to 'preach the Word of God boldly.' *Hosanna-Tabor*, 565 U.S. at 191 (internal citation omitted) (emphasis added).

- Did the employer periodically review the employee's 'skills of ministry' and 'ministerial responsibilities' and provide the employee 'continuing education as a professional person in the ministry of the Gospel'?

*Hosanna-Tabor*, 565 U.S. 191-92.

The Supreme Court made clear in *Hosanna-Tabor* that the application of the 'ministerial exception' is a fact-intensive inquiry. In analyzing the relevant factors, the Court continued:

> Perich's job duties reflected a role in conveying the Church's message and carrying out its mission. Hosanna-Tabor expressly charged her with lead[ing] others toward Christian maturity and teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church. In fulfilling these responsibilities, Perich taught her students religion four days a week, and led them in prayer three times a day. Once a week, she took her students to a school-wide chapel service, and—about twice a year--she took her turn leading it, choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible. During her last year of teaching, Perich also led her fourth graders in a brief devotional exercise each morning. As a source of religious instruction, Perich performed an important role in transmitting the Lutheran faith to the next generation.

*Id.* at 192 (internal citations and quotations omitted). The Supreme Court concluded, "[i]n light of these considerations--the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church--we conclude [ ] Perich was a minister covered by the ministerial exception." *Id.*

After applying the *Hosanna-Tabor* factors, the *Morgan* Court concluded that the plaintiff was not a 'ministerial' employee. In so concluding, the Court reasoned that:

> [t]he Church did not hold Plaintiff out as a minister, and they did not give her any sort of religious title or commission. The Church never charged her with teaching the faith, participating in religious services, or leading devotional exercises. Plaintiff never held herself out as a minister, nor did she ever undergo religious training.

*Morgan* at *61-62. The Court continued that, although the "Church is a religious institution . . . the record contains no facts [supporting] the conclusion [ ] Plaintiff was a ministerial employee." *Id.* at *61.

In many respects, the case at bar is similar to *Morgan*. First, Defendant did not bestow the title of 'minister' on Plaintiff. Rather, Plaintiff's title was "Elementary School Teacher". Second, Plaintiff's position

was not 'commissioned'. The position was non-tenured. Teachers were subject annual teaching contracts of which Defendant reserved the right to non-renew at its discretion. Third, Plaintiff was not charged with teaching the 'faith'. Plaintiff was charged with teaching educational curriculum in accordance with Tennessee state education standards. In fact, Defendant places such minor significance on the teaching of the Baptist faith it does not even require its teachers to be of the Baptist faith. Plaintiff's employment is a prime example of this policy in action. Plaintiff was raised in the *Catholic* faith and had only been a member of the *Baptist* faith for one (1) month prior to her hire date. Defendant merely required Plaintiff to be a non-Catholic Christian. In fact, Plaintiff's instruction to her students made only tangentially-passing reference to Christian teaching, such as God being responsible for the weather.

Furthermore, Plaintiff did not hold herself out as a minister; she held herself out as an elementary school teacher. She did not undergo religious training and education (particularly when compared to the facts of *Hosanna-Tabor*). Plaintiff also did not participate in religious services and did not lead devotional exercises. In short, Plaintiff's job duties were almost entirely secular in nature, similarly to those of the plaintiff in *Morgan*.

### 3. The Sixth Circuit further distilled application of the *Hosanna-Tabor* factors in *Conlon* and *R.G.*

Since this Court decided *Morgan*, the Sixth Circuit has further distilled the factors the Court must consider when determining applicability of the 'ministerial exception'. In *R.G.*, the Sixth Circuit reiterated its 2015 holding in *Conlon*:

> Following *Hosanna-Tabor*, we have identified four factors to assist courts in assessing whether an employee is a minister covered by the exception: (1) whether the employee's title 'conveys a religious—as opposed to secular—meaning'; (2) whether the title reflects 'a significant degree of religious training' that sets the employee 'apart from laypersons'; (3) whether the employee serves 'as an ambassador of the faith' and serves a 'leadership role within [the] church, school, and community'; and (4) whether the employee performs 'important religious functions . . . for the religious organization.'

*R.G.*, 884 F.3d 582-83 (quoting *Conlon*, 777 F.3d at 834-35). When the *Conlon*/*R.G.* four-factor test is applied to the facts of the instant action, it is even clearer than in *Morgan* that the 'ministerial exception' is inapplicable

to Plaintiff's discrimination claims. First, Plaintiff's title, Elementary School Teacher, does not "convey[ ] a religious—as opposed to a secular—meaning". Second, Plaintiff's title does not "reflect a significant degree of religious training that sets the [Plaintiff] apart from laypersons". In fact, it is undisputed Plaintiff does not possess a *significant* degree of religious training; she possesses no educational degrees in theology and attended no theology classes in obtaining any of her academic degrees. Third, Plaintiff does not "serve[ ] as an ambassador of the faith." She is a teacher who: (1) was raised Catholic; and, (2) converted to the Baptist faith one (1) month prior to becoming a teacher for Defendants, which do not require its teachers to be of the Baptist faith. Plaintiff also did not "serve[ ] a leadership role within the school . . .." She was a teacher, nothing more. Finally, Plaintiff did not "perform [ ] important religious functions . . . for the religious organization." Plaintiff did not lead chapel. Plaintiff did not lead daily devotionals. Plaintiff did not create or implement the academic curriculum. In short, she followed the instructions of her superiors and taught kindergarten and second-grade students basic academic subjects. She was by no means a 'minister'. As this Court did so in *Morgan*, it should: (1) conclude in the present action that the 'ministerial exception' is inapplicable; (2) deny Defendants summary judgment; and (3) grant summary judgment to Plaintiff pursuant to Fed. R. Civ. P. 56(j).

### V. CONCLUSION

For all the foregoing reasons, Plaintiff, Tabatha Hutson, respectfully requests an ORDER from the Court DENYING Defendants' motion for summary judgment and awarding summary judgment to Plaintiff pursuant to Fed. R. Civ. P. 56(j).

**[SIGNATURE OF COUNSEL ON PAGE 15 OF 15]**

**RESPECTFULLY SUBMITTED**, this 15th day of April, 2019.

                    **TABATHA HUTSON**

                    By: /s/ James W. Friauf
                    James W. Friauf (#027238)
                    LAW OFFICE OF JAMES W. FRIAUF, PLLC
                    9724 Kingston Pike, Suite 104
                    Knoxville, Tennessee 37922
                    Tele: (865) 236-0347
                    Fax: (865) 512-9174
                    Email: james@friauflaw.com
                    Our File No.: 17-202-EPL

                    *Attorney for Plaintiff, Tabatha Hutson*

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record via the Court's CM/ECF System this 15th day of April, 2019.

                                                /s/ James W. Friauf
                                                 James W. Friauf