IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

TABATHA HUTSON,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀⠀No. 3:18-CV-48
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
CONCORD CHRISTIAN SCHOOL, LLC.,⠀)
and FIRST BAPTIST CONCORD⠀⠀⠀⠀)
FOUNDATION, INC.,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀)

## MEMORANDUM OPINION

This civil action is before the court for consideration of Defendants' motion for summary judgment. [Doc. 27]. Plaintiff has filed a response, and Defendants have submitted a reply. [Docs. 30, 32]. For the reasons that follow, the motion will be granted.

## I.⠀⠀Background

### A.⠀Hiring as Teacher at Concord Christian School

In March 2011, Plaintiff Tabatha Hutson applied for a teaching position at Concord Christian School ("CCS"). [Doc. 28-1 at 1-4]. A significant portion of the teacher application inquired about matters relating to Plaintiff's "Christian Background." [*Id.* at 1-2]. Plaintiff indicated on her application that she had read the school's "Statement of Faith" and fully supported the Statement as written. [*Id.* at 2]. According to Leigh Ledet,

CCS's elementary school principal, the Statement of Faith, provided to all new hires, stated, in relevant part:

> Because [CCS] is a ministry of First Baptist Concord, our doctrinal beliefs are a reflection of the church's beliefs. We are unashamedly a Christian program and we make no apologies for or compromises to our convictions. It is our desire to present the gospel of Jesus Christ so that each child may have the opportunity to accept Him as Lord and Savior of his or her life[.]

[Doc. 28 at 2-3]. The Statement of Faith also contained a list of the Church's fundamental religious beliefs. [*Id*. at 3].

On her application, Plaintiff listed her denominational preference as "Baptist," her current church affiliation as "First Baptist Concord," and her pastor's name as "Doug Sager." [Doc. 28 at 3-4; Doc. 28-1 at 3]. The application asked what church activities Plaintiff was involved in, and she responded that she attended services and Bible Fellowship class every Sunday, worked in the nursery every other Sunday, attended "The Well" once a month, and attended "Mom to Mom" once a month. [Doc. 28 at 4; Doc. 28-1 at 3]. The application then asked "What other Christian service have you done since becoming a Christian?" and Plaintiff responded that she reached out to single moms by calling and e-mailing them to invite them to "The Well," led a table at "The Well," and participated in fellowship workdays with her Sunday school class. Next, the application asked about Plaintiff's routine of personal Bible study and prayer, and she responded that she used Bible reading plans every night before bed, journaled once or twice a week, and led a daily devotion with her son each morning. [*Id*.]. The application then asked for a list of books that Plaintiff had read in the past two years that had "helped [her] grow spiritually," and Plaintiff provided several Christian book titles. [Doc. 28-1 at 3]. Finally,

the application asked Plaintiff to provide a brief summary of her "Christian testimony." Plaintiff responded that she considered herself a "baby Christian," as she had been raised Catholic but converted to Baptist in 2005. Plaintiff indicated that, at the time of her conversion, she "felt the Holy Spirit pull at [her]," she "prayed and asked God to take [her] whole life," and she "gave Him [her] heart and made Him Lord of [her] life." [Doc. 28 at 4-5; Doc. 28-1 at 3].

The teacher application included a "Declaration of Moral Integrity," which stated that CCS "expects all of its employees to model the same Christian values and lifestyle that it seeks to inculcate in its students." [Doc. 28 at 5; Doc. 28-1 at 4]. The declaration continued on to say that the applicant declared that the applicant had not, in the past year, engaged in, was not currently engaging in, and committed, during her term of employment not to engage in "inappropriate sexual conduct," which the declaration defined to include "heterosexual activity outside of marriage (e.g., premarital sex, cohabitation, and extramarital sex)[.]" Plaintiff signed the declaration. [*Id.*].

On August 1, 2011, Plaintiff was hired as a kindergarten teacher at CCS. [Doc. 28 at 6]. As part of her new hire paperwork, Plaintiff signed a statement that she committed "to conduct [her]self in a manner that demonstrates a Christ-like attitude in performing all position responsibilities in order to exalt our Lord and Savior Jesus Christ." [*Id.*; Doc. 28-2]. Thereafter, Plaintiff was employed through a series of contracts beginning in August of a school year and ending in June of the following year. [Doc. 28 at 6]. Her last contract was from August 2016 to June 2017, at which point she was assigned to teach second grade. [*Id.*].

**B. CCS Policies in 2016-2017 School Year**

In May 2016, Plaintiff signed a "Letter of Commitment for Employment" for the 2016-2017 school year. [Doc. 28-3 at 1]. This letter stated that CCS "is unique in that it is a Christian school and is committed to maintain in the framework of Christian principles and high educational standards" and that "it is the policy of [CCS] to employ highly qualified Employees who support Christian education in pursuit of such high educational standards." The letter noted that the employee may be suspended or discharged for good cause, including "any conduct not in keeping with the Christian faith[.]" [*Id.*].

CCS's 2016-2017 Faculty/Staff Handbook ("the Handbook"), stated that the mission of CCS "is to lead students to connect with Christ, grow in faith, and serve with conviction, making a world of difference." [Doc. 28 at 10; Doc. 28-4 at 6]. Within the section labeled "Concord Christian School Philosophy," the Handbook stated:

> The fear of the Lord is the beginning of wisdom. At the heart of the Christian philosophy of education is the acknowledgement that God created all things and that they exist by His power and for His pleasure. Only through Christ can there be a unity which gives meaning to all parts of life. *An education which fails to acknowledge God and His work will always be woefully inadequate and incomplete.*
>
> An education which understands the nature of reality, God, the universe, man and His purpose for existence, truth and absolutes, *must be one which teaches the Bible as God's infallible Word* and sees each student as created in God's image for His purpose. Life is then seen as contributing to God's purpose and man's ultimate goal is to know and obey God.
>
> [CCS] *endeavors to give a completely God-centered orientation of life to each student. It strives to help produce the mind of Christ in its students and to establish a well-grounded, biblical world view.* Academics are not a means of self-promotion or pride but a way of increasing one's awareness of God and being useful in His kingdom. Christians should excel in all subject

areas because they put Christ first and see their work as unto the Lord and not unto men.

The ultimate responsibility of educating a child has been given to the parents. [CCS] operates as an extension of and partner with the home and church in *training children to be godly*, and also focuses on developing the whole child: spiritually, academically, athletically, creatively, and socially.

[Doc. 28 at 10-11; Doc. 28-4 at 6 (emphasis added)].

The Handbook also contained several commitment statements on behalf of the administration, staff, and congregation of First Baptist Concord. [Doc. 28 at 6-7; Doc. 28-4 at 7-8]. The commitment statements announced that CCS "is a ministry of First Baptist Concord," and is "unashamedly a Christian program" that "make[s] no apologies for or compromise to [its] convictions." [Doc. 28 at 6-7; Doc. 28-4 at 8]. This section also stated that "[i]t is our desire to present the gospel of Jesus Christ so that each child may have the opportunity to accept Him as Lord and Savior of his or her life." [Doc. 28 at 7; Doc. 28-4 at 8]. The Handbook's commitment statements further stated that CCS intended to recruit and retain employees who:

1. Profess to and live the example of a child of God, saved by the atoning death of His Son, our Lord and Savior, Jesus Christ.

2. Believe and agree with [CCS's] philosophy and foundation,

3. *Feel personally called into Christian education by God*, and

4. Possess the ability and aptitude to teach and lead through prior educational achievements and experience.

[*Id.* (emphasis added); *see also* Doc. 28 at 2].

The Handbook then listed seven "belief statements," summarizing the school's religious beliefs. [Doc. 28 at 7-8; Doc. 28-4 at 8-9]. Next, the Handbook listed seven

"biblical education principles." [Doc. 28 at 8; Doc. 28-4 at 9]. Of note, these principles included that: (1) "[t]he education of children and youth must have as its primary goals the salvation and discipleship of the next generation;" (2) "[t]he education of children and youth must be based on God's Word as the absolute truth;" and (3) "[t]he education of children and youth results in the formation of a belief system or worldview that is based on Biblical teaching." [*Id.*].

The Handbook also laid out the "overall objectives of a [CCS] education," and defined the objectives of the school, the teacher, the parents, and the student. [Doc. 28 at 9-10; Doc. 28-4 at 9-10]. As to the school, the Handbook stated, *inter alia*, that CCS recognizes the "many facets that contribute to the education development of [its] students" and "[s]uch recognition enables [it] *to minister to [its] students on multiple levels*." [Doc. 28 at 9; Doc. 28-4 at 9 (emphasis added)]. The Handbook stated that the teacher:

- *Will be committed to the Lordship of Jesus Christ and set before students a noble example of Christian life and conduct*
- Will seek to know each student's abilities, feelings, values, and hopes.
- Will build many roads to success into the instructional program
- Will communicate what is expected of students.
- Will communicate how students can get assistance to achieve successfully what is expected of them.
- *Will respect each student as an image bearer of God*, regardless of the student's performance.
- *Will lead the life of a Christian scholar* in the vast and exciting worlds of fine arts, science, mathematics, language, literature, history, etc. The teacher will be a *spiritual and intellectual model* for students to follow and will have something rich and challenging to offer students.
- Will carefully examine and prepare for the learning styles of students.
- Will bring great enthusiasm to the teaching-learning transaction.
- Will have a passion for learning and an ever increasing mastery of the subjects they teach.

- Will set before students the rigorous requirements of the pursuit of academic excellence.

[Doc. 28 at 9-10; Doc. 28-4 at 10-11 (emphasis added)].

## C. Non-Renewal of Teaching Contract

In May 2017, Ledet met with Plaintiff, and Plaintiff confirmed reports that she had become pregnant out of wedlock. [Doc. 28 at 12]. According to Plaintiff, this meeting was the first time that her pregnancy was discussed with anyone in the administration at CCS, but other teachers knew about the pregnancy. [Doc. 31-1 at 2]. Plaintiff contends that, at the meeting, Ledet informed her that CCS would not be offering Plaintiff a contract for the 2017-2018 school year. [Doc. 28 at 12; Doc. 31-1 at 4-5]. CCS did, however, permit Plaintiff to finish the 2016-2017 school year. [Doc. 28 at 12; Doc. 31-3 at 5].

Ledet states that she had discussed not renewing Plaintiff's contract with the Head of School, Ruston Pierce, several times during the 2016-2017 school year. [Doc. 31-4 at 32]. Ledet states that she had two separate meetings with Plaintiff, one in which she discussed the fact that Plaintiff was pregnant, and another in which she informed Plaintiff that her contract was not being renewed. [*Id*. at 36]. The meeting about Plaintiff's pregnancy occurred first, and was prompted by parents and other teachers informing Ledet that there was an unmarried teacher who was expecting. [*Id*.]. Although Ledet and Pierce had discussed not renewing Plaintiff's contract, the final decision had not been made until after learning that Plaintiff was pregnant. [*Id*. at 37-38]. Ledet admitted that Plaintiff's pregnancy was a motivating factor in the decision not to renew her contract, because it violated the school's moral value statement, the expectations of parents, and biblical

principles. [*Id*. at 38]. Specifically, Ledet stated that this violated the morality clause's prohibition on premarital sex. [*Id*. at 38]. Ledet was not aware of whether any other CCS employees engaged in premarital sex while employed at CCS, and CCS does not monitor such activity. [*Id*. at 38-39]. Aside from Plaintiff, Ledet could not recall any CCS elementary school teacher having their contract nonrenewed for a violation of the morality code. [*Id*. at 13-14].

### D. Religious Components of Plaintiff's Teaching Position

Plaintiff defined a "minister" as "someone who has an educational background, has gone to seminary, and who leads the church." [Doc. 31-3 at 10]. None of the teachers at CCS met this definition. [*Id*. at 10]. Plaintiff agreed that CCS was a ministry of the church. [*Id*. at 10-11]. The formal title for an elementary school teacher at CCS was "elementary teacher." [Doc. 31-4 at 20-21]. Ledet stated that no employee of CCS had the formal title of "minister," but CCS referred to its teachers as "being ministerial in the classroom." [*Id*. at 21]. Ledet asserted that some of the school documents, including handbooks and statements, refer to the teachers as ministerial, and Ledet further stated that CCS has an expectation that teachers will evangelize to students and use the Bible to direct students in day-to-day life. [*Id*.]. Ledet defined a minister as "anyone who is taking God's word and applying it daily to the lives of children and using that idea of raising up the kids with values and morals that we find in God's word, evangelizing students so that they too can have a saving relationship with Jesus." [*Id*. at 22]. Under this definition, Ledet stated that elementary school teachers would be ministers. [*Id*. at 23]. Ledet further stated that no position at CCS would not be ministerial under this definition. [*Id*. at 24]. Ledet stated

that the roles of elementary teacher at CCS and pastor at First Baptist had similarity. [*Id.* at 52-53].

During her employment with CCS, Plaintiff did not take any courses in theology or religion at a secondary education facility outside the church. [Doc. 31-3 at 11]. Ledet stated that CCS does not require its teachers be a certain denomination of Christianity, but they must be Christian believers. [Doc. 31-4 at 9]. Ledet clarified that teachers must be protestant Christians, and members of the Catholic faith were not allowed to become teachers at CCS. [*Id.* at 17]. However, to be a candidate for an elementary school teacher, an individual does not have to have any religious component in their educational background. [*Id.* at 9]. Thus, the fact that Plaintiff had a secular degree, and had taken no courses in Christian philosophy or education was acceptable to CCS at the time it hired Plaintiff. [*Id.* at 18]. Regarding education provided to CCS's elementary teachers, Ledet stated that CCS conducts biblical integration workshops for its teachers at least yearly, in addition to other in-service training. [*Id.* at 29]. CCS admits that it was aware that Plaintiff did not possess any educational degrees from any religiously-affiliated educational institutions when it hired Plaintiff. [Doc. 31-9 at 1]. CCS was also aware, when it hired Plaintiff, that she had not taken any courses in "Religious Philosophy of Education." [*Id.* at 2]. CCS further admits that Plaintiff was not an ordained minister during her employment with CCS, and was not required to be an ordained minister as a condition of employment. [*Id.* at 3].

According to Ledet, Plaintiff was hired by CCS to teach not only general education, but to incorporate the "Word of God" into her lessons. [Doc. 28 at 6]. Ledet states that

CCS "designated the Plaintiff to be a minister of the Christian faith, and the parents of our students expected that." [*Id*. at 7]. Ledet also states that, in accordance with the Handbook's biblical education principals, Plaintiff helped develop a lesson plan format with other second-grade teachers at CCS, which required her to incorporate biblical studies into her curriculum. [*Id*. at 11]. Ledet emphasizes that Plaintiff had the "important role" of "transmitting and teaching Christian faith in her lesson plans," and her position as a second-grade teacher required her to "biblically integrate" all subjects she taught. [*Id*. at 12].

While a teacher at CCS, Plaintiff never led chapel services, and neither did other kindergarten or second grade teachers. [Doc. 31-3 at 13]. She occasionally led daily morning devotionals with her class, which involved reading to her class from a devotional book. [*Id*. at 14]. Plaintiff estimated that, during the 2016-2017 school year, she led the morning devotional less than five times. [*Id*. at 15]. She stated that, in prior years, she may have led the devotional somewhat more frequently, and when she taught Kindergarten, parents came in to lead the devotional. Plaintiff stated that, for second grade teachers, it was normal within CCS for the morning devotionals to occur with that frequency. [*Id*.]. Plaintiff stated that lesson plans at CCS are all shared, and in the 2016-2017 school year, she did not create the Bible lesson plans, but rather, those lesson plans were shared with her by other second grade teachers. [*Id*. at 22]. She did teach the Bible lessons in the 2016-2017 school years. [*Id*.]. Ledet stated that, while Plaintiff never led chapel service, her class "probably did," and Plaintiff would have helped her class prepare for chapel. [Doc. 31-4 at 55-56]. Ledet also believed that Plaintiff led devotional exercises on a daily

basis. [*Id*. at 56]. Performance records indicate that Plaintiff received evaluations based on how she "integrate[d] Biblical principals into the lesson." [Doc. 31-11 at 4].

Plaintiff stated that she felt like she was "supposed to be a teacher," although, when asked if she felt "called" to be a teacher, Plaintiff stated that she did not understand the meaning of the term "called." [Doc. 31-3 at 18]. Plaintiff later stated that her understanding of the term "called" meant that someone was voted on by the church, and, since that did not happen for her, she did not believe that she was "called." [*Id*. at 20]. Ledet explained her own understanding of the term "called" as meaning that "through prayer and petition to the Lord, that he answers callings on your life[.]" [Doc. 31-4 at 5]. Ledet stated that elementary school teachers at CCS should be "called" to that position. [*Id*. at 25]. CCS's elementary school teachers are also supposed to serve as Christian role models for the students. [Doc. 31-4 at 26].

## II.    Standard of Review

Summary judgment is appropriate when the moving party shows that the record— the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's case," at which point the non-moving party,

to withstand summary judgment, must identify facts in the record that create a genuine issue of material fact. *Id*. at 324-25.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. Analysis

The critical question raised by Defendants' motion for summary judgment is whether Plaintiff's federal and state claims of employment discrimination are barred by the so-called ministerial exception. In 2012, the Supreme Court first recognized the ministerial exception to employment discrimination laws, concluding that the application of such legislation to claims concerning the employment relationship between a religious institution and its ministers would violate both the Free Exercise Clause and the

Establishment Clause of the Constitution. *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 188-89 (2012). "For the ministerial exception to bar an employment discrimination claim, two factors must be present: (1) the employer must be a religious institution, and (2) the employee must be a ministerial employee." *Dias v. Archdiocese of Cincinnati*, No. 1:11-cv-251, 2012 WL 1068165, at *4 (S.D. Ohio Mar. 29, 2012) (quoting *E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church and School*, 597 F.3d 769, 778 (6th Cir. 2010) (reversed on other grounds)). The parties here do not dispute whether CCS qualifies as a religious institution, but rather, contest whether Plaintiff was a "ministerial employee" such that the exception applies. Accordingly, the Court will limit its analysis to this issue.

In *Hosanna-Tabor*, the Supreme Court concluded that this ministerial exception is not limited to the head of a religious congregation, but, nonetheless, declined to "adopt a rigid formula for deciding when an employee qualifies as a minister." 565 U.S. at 190. Rather, the Court looked at four factors in concluding that the Plaintiff-employee, Cheryl Perich, was a minister covered by the ministerial exception: (1) Perich's formal title; (2) the substance reflected in that title; (3) Perich's own use of that title; and (4) the religious functions Perich performed for the Church. *Id*. at 191-92.

As to the first factor, the Court stated that the Church held Perich out as a minister, with a role distinct from that of most members, as she was labeled a "called teacher" as opposed to the Church's other designation, "lay teacher." *Id*. at 177, 191. As to the substance reflected in that title, the Court noted that it reflected a significant degree of religious training (eight college-level courses in religious topics) and a formal process of

commissioning. *Id*. at 191. Third, the Court noted that Perich held herself out as a minister of the church, by accepting the formal call to religious service, as well as claiming a special housing allowance on her taxes that was only available to employees earning their compensation "in the exercise of the ministry." *Id*. at 191-92. Finally, the Court stated that Perich's job duties "reflected a role in conveying the Church's message and carrying out its mission." *Id*. at 192. Specifically, the Court noted that the Church expressly charged Perich with "lead[ing] others toward Christian maturity" and "teach[ing] faithfully the Word of God," and Perich taught her students religion four days a week, led them in prayer three times a day, took her students to a school-wide chapel service once a week, led the school-wide chapel service twice a year, and led her students in a brief devotional exercise each morning. In light of these factors, the Court concluded that Perich was a minister for purposes of the ministerial exception. *Id*.

The Court declined to limit the analysis of whether an employee is a minister to these four factors. Indeed, the Court noted that the amount of time an employee spends on particular activities (religious or secular) is relevant in assessing the employee's status, but cannot be considered in isolation without regard to the nature of the religious functions performed and other considerations. *Id*. at 194. Finally, the Court stated that "[t]he purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Id*. at 194-95 (internal citations omitted).

Both Justice Thomas and Justice Alito wrote concurring opinions in *Hosanna-Tabor*, expressing concerns about the factors to be considered in determining whether an employee qualifies as a "minister" under the exception. *Id*. at 196-99. Justice Thomas argued that courts should "defer to a religious organization's good-faith understanding of who qualifies as its minister," noting that the question of whether an employee qualifies as a minister is itself religious in nature. *Id*. at 196-97. Justice Alito, joined by Justice Kagan, argued that the key factor in determining whether an employee is a minister is the function performed by the individual. *Id*. at 198. Justice Alito concluded that the ministerial exception should apply to an employee "who leads a religious organization, conducts worship services or important religious ceremonies or rituals, *or serves as a messenger or teacher of its faith*." *Id*. at 199 (emphasis added).

Since *Hosanna-Tabor*, the Courts of Appeals have grappled with the four factors enunciated by the Supreme Court, and the relevance of each in determining whether the ministerial exception applies. The Sixth Circuit addressed the ministerial exception, as recognized in *Hosanna-Tabor*, in *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 832 (6th Cir. 2015). Plaintiff Conlon had been employed as a "spiritual advisor" by InterVarsity, and was terminated after divorcing her husband. 777 F.3d at 831. The Sixth Circuit addressed each of the four considerations set out by *Hosanna-Tabor*. As to the first factor, the Court concluded that, unlike Perich, Conlon did not have the title minister, but instead, was referred to as a "spiritual director" or "spiritual formation specialist." *Id*. at 834. The Court concluded that either title was sufficient to indicate that the position was ministerial in nature. *Id*. The Court stated that, when addressing this consideration, courts

need only determine whether the wording of the title conveys a religious, as opposed to a secular, meaning. *Id*. at 834-35. As to the second consideration, the Court found that, while Conlon earned her certification in "spiritual direction," there were no details in the record that indicated that Conlon was subject to the same type of rigorous requirements that Perich satisfied to earn her ministerial title. *Id*. at 835. Thus, the Court concluded that the second consideration had not been demonstrated. *Id*. Third, the Court found that nothing in the pleadings suggested that Conlon had the sort of public role of interacting with the community as an ambassador of faith on par with Perich's leadership role within her church, school, and community, and thus, the third consideration had not been established. *Id*. Finally, as to Conlon's religious function, the Court stated that part of Conlon's duties were to assist others to cultivate "intimacy with God and growth in Christ-like character," which is a ministerial function. *Id*.

The Sixth Circuit addressed both Justice Thomas's and Justice Alito's concurring opinions in *Hosanna-Tabor*, concluding that Justice Thomas would emphasize a broad reading of the first *Hosanna-Tabor* factor, and Justice Alito would rely on the fourth *Hosanna-Tabor* factor. *Id*. The Court ultimately stated that, the two factors present in that case—formal title and religious function—were together sufficient to merit application of the ministerial exception. *Id*. However, the Sixth Circuit declined to decide whether either of the factors identified by Justice Alito or Justice Thomas, standing alone, would be sufficient to merit application of the ministerial exception. *Id*.

Other Circuits have also concluded that an employee qualifies as a minister for purposes of the ministerial exception based on a finding that only some of the

*Hosanna-Tabor* factors are present. The Fifth Circuit first confronted the ministerial exception, post-*Hosanna-Tabor*, in the context of a music director who was terminated from his position at a Catholic church. *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 170-71 (5th Cir. 2012). The Fifth Circuit ultimately concluded that, because Plaintiff "played an integral role in the celebration of Mass," by playing the piano during the service, he "furthered the mission of the church and helped convey its message to the congregation." *Id*. at 177. As a result, the Fifth Circuit concluded that the plaintiff was a minister for purposes of the ministerial exception. *Id*.

The Second Circuit first addressed the ministerial exception after *Hosanna-Tabor* in the context of a Catholic school principal. *Fratello v. Archdiocese of New York*, 863 F.3d 190, 192 (2d Cir. 2017). The Second Circuit noted that it is the "relationship between the activities the employee performs for her employer, and the religious activities that the employer espouses and practices, that determines whether employment-discrimination laws implicate the group's First Amendment rights." *Id*. at 205-06. The Court ultimately concluded that the second, third, and fourth *Hosanna-Tabor* factors were present, and thus, the ministerial exception applied. *Id*. at 207-08. Although the Second Circuit did not address the weight of the other factors, the Court referred to the fourth factor as the "most important consideration" and even the "fundamental consideration." *Id*. at 208-09.

The Seventh Circuit has addressed the *Hosanna-Tabor* factors in the context of a Hebrew teacher at a Jewish Day School. *Grussgott v. Milwaukee Jewish Day School, Inc.*, 882 F.3d 655, 656 (7th Cir. 2018). The Court concluded that only the second and fourth *Hosanna-Tabor* factors—the substance reflected in the title and the employee's function—

were present. *Id*. at 659-61. As to the second factor, the Court concluded that, although the plaintiff's title was "grade school teacher," or "Hebrew teacher," Hebrew teachers at the school were expected to follow the unified Tal Am curriculum, meaning that the school expected Hebrew teachers to integrate religious teachings into their lessons. *Id*. at 659. Thus, the Court concluded that the substance of the title weighed in favor of applying the ministerial exception. *Id*. In addressing the fourth factor, the Court also stated that it was "sufficient that the school clearly intended for [the teacher's] role to be connected with the school's Jewish mission." *Id*. at 660. Thus, the Court concluded that, whether the plaintiff had discretion in planning her lessons was irrelevant, and it was the school's expectation that plaintiff would convey religious teachings that mattered. *Id*. at 660-61.

On the other hand, the Ninth Circuit has concluded that, when only the fourth *Hosanna-Tabor* factor is present, such is insufficient to merit application of the ministerial exception. *Biel v. St. James School*, 911 F.3d 603, 609-10 (9th Cir. 2018). In that case, the plaintiff had been a fifth-grade teacher at a Catholic school. *Id*. at 605. While the school preferred to hire Catholic teachers, such was not a requirement, and teachers were not required to have any training in Catholic pedagogy. *Id*. The Court concluded that the only similarity between plaintiff and the *Hosanna-Tabor* plaintiff was the fourth factor, because the plaintiff taught religion curriculum for around 30 minutes a day. *Id*. at 605, 609. However, the Ninth Circuit distinguished the facts of that case, stating that the plaintiff's role in teaching was limited to teaching from a book required by the school and incorporating religious themes into other lessons. *Id*. at 609. The Ninth Circuit concluded that, if the ministerial exception applied on this factor alone, the majority of the analysis in

*Hosanna-Tabor* would be irrelevant dicta. *Id*. Accordingly, the Ninth Circuit declined to apply the ministerial exception. *Id*. at 610. The Ninth Circuit later denied an *en banc* rehearing on this matter. *Biel v. St. James School*, 926 F.3d 1238, 1239 (9th Cir. 2019). Dissenting from the denial of *en banc* rehearing, Judge Nelson noted that the Court had "embrace[d] the narrowest construction of the First Amendment's 'ministerial exception' and split[] from the consensus of [its] sister circuits that the employee's ministerial function should be the key focus." *Id*.

This Court rejects the Ninth Circuit's approach in this matter, and agrees with the majority opinion that the key factor in determining whether an employee is a "minister" within the scope of the ministerial exception is the employee's function in the employer's religious mission. This Court, however, need not determine whether this factor alone merits the application of the ministerial exception, because, as discussed below, the Court finds that other factors weigh in favor of applying the ministerial exception in this matter.

Here, the first factor weighs against application of the ministerial exception. Plaintiff's formal title at CCS was "elementary teacher." [Doc. 31-4 at 20-21]. Nothing in this title inherently suggests that the position is ministerial or contains any religious component. Thus, Plaintiff's formal title does not weigh in favor of applying the ministerial exception.

However, the second factor—the substance reflected in Plaintiff's title—weighs in favor of applying the ministerial exception in this case. While the parties agree that no formal religious training was required for the position of elementary teacher at CCS, [doc. 31-4 at 9, 18; doc. 31-9 at 1-2], elementary teachers were required to be protestant

Christians [doc. 31-4 at 9, 17]. It is also clear from the record that CCS expected all elementary teachers to actively engage in evangelizing to their students. [Doc. 28 at 6-7; Doc. 28-4 at 8]. CCS's 2016-2017 school year handbook made clear that CCS believed that religion was a fundamental component to the education of its students, stating that "[a]n education which fails to acknowledge God and His work will always be woefully inadequate and incomplete." [Doc. 28-4 at 6]. The Handbook also specifically stated that one of the primary goals of CCS was to "present the gospel of Jesus Christ so that each child may have the opportunity to accept Him as Lord and Savior of his or her life." [*Id.* at 8]. In light of these statements, it is clear that CCS expected its teachers to convey religious messages to students. Additionally, CCS indicated in its Handbook that it expected that teachers be "called into Christian education by God." [*Id.*]. Although the parties dispute the meaning of the term "called" in the Baptist faith, it is clear that CCS intended that its elementary teachers felt led by God to take such position. Moreover, CCS clearly intended for its elementary teachers to serve as Christian role models for their students. For example, the Handbook listed, as the first expectation for CCS teachers, that the teacher "[w]ill be committed to the Lordship of Jesus Christ and set before students a noble example of Christian life and conduct[.]" [*Id.* at 10]. Although the expectation that a teacher be a "role model" itself may be insufficient to indicate a ministerial role, *see Dias v. Archdiocese of Cincinnati*, 1:11-cv-251, 2012 WL 1068165, at *5 (S.D. Ohio Mar. 29, 2012) (concluding that a technology coordinator at a Catholic school was not a minister merely because she was expected to serve as a role model), combined with the other facts discussed above, it is clear to the Court that the substance of Plaintiff's title of elementary

teacher at CCS indicated a ministerial role. Thus, this factor weighs in favor of applying the ministerial exception.

As to the third factor—Plaintiff's use of her title—there is no indication in the record that Plaintiff considered herself a minister. Indeed, Plaintiff stated that, in her opinion, a Baptist minister was "someone who has an educational background, has gone to seminary, and who leads the church." [Doc. 31-3 at 10]. Plaintiff did not consider any of the teachers at CCS to be ministers. [*Id.*]. The record is devoid of any facts indicating that Plaintiff ever held herself out as a religious leader, or claimed any benefits specific to ministers. Thus, the Court concludes that the third factor weighs against application of the ministerial exception.

As the Court indicated previously, the fourth factor—the religious functions Plaintiff performed—is a key factor in determining whether Plaintiff is a minister for purposes of the ministerial exception. The Court concludes that the fourth factor weighs in favor of applying the ministerial exception in this case. Plaintiff notes that, during her term as an elementary teacher at CCS, she never led any chapel services. [Doc. 31-3 at 13]. However, the factual record before the Court indicates that Plaintiff may have assisted her class in preparing to lead a chapel service [doc. 31-4 at 55-56], and it appears that Plaintiff at least attended chapel services with her class [doc. 31-3 at 13-14]. Plaintiff also admits that she led morning devotions with her class, although she states that, during the 2016-2017 school year, she led these devotions only around five times throughout the year. [Doc. 31-3 at 14-15]. Moreover, although she did not create the Bible lessons plans in the 2016-2017 year, Plaintiff admits that she taught Bible lessons to her students. [*Id.* at 22].

It is also evident from Plaintiff's lesson plans, and evaluations, that she integrated biblical principles into her lessons in other subjects. [Doc. 31-11 at 4, 10]. Indeed, it is clear to the Court that CCS expected Plaintiff to teach religious messages, both through Bible lessons, and incorporation of religious themes and messages into other lessons. [Doc. 28 at 6, 12; Doc. 28-4 at 6; Doc. 31-4 at 29]. Although Plaintiff's religious functions may not rise to the level of those of the plaintiff in *Hosanna-Tabor*, it is nonetheless clear that, based on Plaintiff's religious functions, she "serve[d] as a messenger or teacher of [CCS's] faith." *Hosanna-Tabor,* 565 U.S. at 199 (Alito, J., concurring). Accordingly, the Court concludes that the fourth factor weighs in favor of applying the ministerial exception.

Although the Court certainly sympathizes with Plaintiff's predicament, the Court nonetheless must safeguard the fundamental First Amendment freedoms that the ministerial exception seeks to protect. In light of the Sixth Circuit's holding that the first and fourth *Hosanna-Tabor* factors alone are sufficient to merit application of the ministerial exception, *Conlon*, 777 F.3d at 832, the Court is bound to conclude that the second and fourth *Hosanna-Tabor* factors, both present here, are sufficient to merit application of the ministerial exception. The Court is also persuaded by the incredible similarity between this matter, and the facts in *Grussgott*. Accordingly, the Court concludes that Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200e, *et seq*., and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, *et seq*., are barred by the ministerial exception, and those claims are hereby dismissed.

### IV.    Conclusion

Accordingly, for the reasons stated herein, the Defendants' motion for summary judgment [doc. 27] will be granted, and this case will be dismissed.  An order consistent with this opinion will be entered.


       s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE